## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| Craig A. Covic and Mark J. Abbott, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FedEx Corporation, the FedEx Corporation Employees' Pension Plan, the Retirement Plan Investment Board, and John/Jane Does 1–10,<br><br>Defendants. | **Civil Action No.: 2:23-cv-02516**<br><br><br><br><br><br>CLASS ACTION |

Plaintiffs Craig A. Covic and Mark J. Abbott, by and through their undersigned attorneys, on behalf of themselves and all others similarly situated, state and allege matters pertaining to themselves and their own acts, upon personal knowledge, and as to all other matters, upon information and belief, based upon the investigation undertaken by their counsel, as follows:

## I.   INTRODUCTION

1.   This is a case about Defendants unlawfully shortchanging pilots of the FedEx Corporation Employees' Pension Plan (the "**Plan**") by millions of dollars through their use of outdated mortality tables in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"). By using outdated mortality tables to calculate joint and survivor annuities and preretirement survivor annuities for *only* pilots of the Plan, Defendants have harmed the financial security of these former pilots and their loved ones, to Defendants' financial gain.

2.   Defendants had a fiduciary duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence." ERISA

§ 404(a)(1), 29 U.S.C. § 1104(a)(1).  Defendants disregarded that duty, electing to use unreasonable and outdated formulas for payment of pension benefits that substantially underpaid Plan Participants for their own financial gain.

3.      Plaintiffs bring this class action against FedEx Corporation ("**FedEx**"), the FedEx Corporation Employees' Pension Plan ("**Plan**"), the Retirement Plan Investment Board of the Plan (the "**Investment Board**"), and the individual members of the Investment Board during the relevant time period (collectively, with FedEx and the Investment Board, "**Defendants**") for violations of ERISA's actuarial equivalence requirements.

4.      Plaintiffs and the Class (as defined below) are vested participants in the Plan, which deprives them of monies to which they are entitled. Specifically, Plaintiffs and Class Members are retired pilots (and their beneficiaries) who receive pension benefits in the form of a joint and survivor annuity or a preretirement survivor annuity.

5.      Defendants use formulas based on outdated actuarial assumptions to calculate these types of benefits. These formulas result in Plaintiffs and Class Members receiving less than the "actuarial equivalent" of their vested benefits, in violation of ERISA's actuarial equivalence requirements.

6.      FedEx sponsors the Plan, under which Participants earn pension benefits under the Traditional Pension Benefit ("**TPB**") formula in the form of a single life annuity ("**SLA**"). An SLA is a monthly benefit for the life of the participant. However, participants can elect to receive their pension benefits in forms other than an SLA, such as a certain and life annuity or joint and survivor annuity ("**JSA**").

7.      For married participants the default form of pension payment is a JSA, which provides retirees with a monthly annuity for their lives and, when they die, a contingent annuity

for the life of their spouse or beneficiary. *See* 29 U.S.C. § 1055(a). Plans label JSAs as a percentage of the benefit paid during the beneficiary's life. A 50% JSA pays the spouse half the amount the retiree received each month; a 75% JSA pays the spouse three-quarters of what the retiree received each month; a 100% JSA pays the beneficiary the same amount the retiree received. Unless they choose otherwise and obtain their spouses' consent, Participants who are married when their benefits commence automatically receive a 50% JSA.

8.      To convert the SLA to the JSA, the Plan uses a formula based on actuarial assumptions — consisting of an interest rate and mortality table — to determine the amount by which it reduces a Participant's SLA to arrive at the monthly JSA benefit amount. A JSA recipient's monthly amount will generally be less than the amount he or she would receive as an SLA because pension plans must account for paying benefits for two lives (the retiree and his or her beneficiary) rather than one. This case concerns how Defendants unlawfully reduce Participants' SLA to arrive at the monthly JSA amount.

9.      ERISA requires that JSA benefits that pay between 50% to 100% (also known as "Qualified Joint and Survivor Annuities" or "**QJSAs**") be at least the "actuarial equivalent" of the retiree's SLA. *See* 29 U.S.C. § 1055(d); *see also* § 1055(e) (discussing the qualified preretirement survivor annuity ("**QPSA**") and how benefits must not be less than the amount which would be payable as a survivor annuity under a QJSA).

10.     Two benefit forms are actuarially equivalent when the present values of the two benefits are the same, based on reasonable actuarial assumptions. Calculating present value requires interest rates and mortality tables. Interest rates discount the value of expected future payments to the date of the calculation. Because of the time value of money, a dollar today is worth more than a dollar in the future because that dollar can be invested today and earn interest. As a

result, to calculate the value of a benefit stream one must use a rate to discount the future payments to today's dollars. Mortality tables predict the rate at which retirees will die at any given age and, therefore, the chance they will receive an additional year of benefits. The interest rate and mortality table work together to generate a "conversion factor" that is applied to a participant's SLA. Once applied, the conversion factor reduces the SLA to arrive at an alternate benefit form. The actuarial assumptions used in the formula directly impact the conversion factor.

11.     For the last several decades, mortality rates have improved. Generally, retirees today live longer than retirees from the 1960s and 1970s. Accordingly, mortality tables based on data from the 1960s and 1970s predict that people will die earlier than contemporary mortality tables. All else being equal, using an antiquated mortality table to calculate a conversion factor decreases the present value of an optional benefit form and, in turn, the monthly amount retirees receive. For example, a plan using a mortality table from the 1970s to calculate a 50% JSA — interest rates being equal — may produce a conversion factor of 0.90. In this scenario, a participant entitled to a monthly SLA benefit of $1,000 would receive $900 per month as a 50% JSA (his or her spouse would receive $450 per month). By contrast, a plan using a mortality table from 2023 — interest rates being equal — may produce a conversion factor of 0.93. The same retiree would receive $930 per month as a 50% JSA (his or her spouse would receive $465 per month).

12.     When plans make actuarial conversions from one benefit form to another or from normal retirement age to early retirement, ERISA's actuarial equivalence requirements apply. These statutory requirements, along with the associated Treasury regulations, ensure that, all else being equal, the forms of pension benefit that a retiree receives, and the time they receive those benefits relative to their normal retirement age, are *at least* as valuable as the SLA they would receive at normal retirement age. *See* ERISA §§ 205(d) and (e) and 204(c)(3), 29 U.S.C. §§ 1055(d)

4

and (e) and 1054(c)(3); 26 C.F.R. § 1.401(a)-20, Q&A 16. ERISA's actuarial equivalence requirements are designed to ensure that married participants receiving JSAs and early retirees are not penalized for their choices, regardless of the optional form they select or when they retire.

13.     ERISA § 204(c)(3) requires that an employee's accrued benefit, if it "is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . shall be the actuarial equivalent of such benefit[.]" 29 U.S.C. § 1054(c)(3). Failing to provide a participant with at least the actuarial equivalence of his or her vested benefit results in an illegal forfeiture in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

14.     Defendants violate ERISA's actuarial equivalence requirements by using antiquated actuarial assumptions, which produce unreasonably low conversion factors and, therefore, depress the value of JSAs and preretirement survivor annuities offered to retired pilots. Despite the considerable increases in life expectancy over the past 50 years, Defendants continue to use antiquated actuarial assumptions to calculate pension benefits for retired pilots. For *only* pilots, Defendants determine the amount of their JSAs based on a formula that uses the Uninsured Pensioners 1984 mortality table ("**UP-84**") — which is based on data from the 1960s and 1970s — set back three (3) years for beneficiaries.[1] Coupled with a 7% interest rate, the UP-84 produces conversion factors that are consistently lower than the conversion factors produced by contemporary actuarial assumptions, causing retired pilots of FedEx who select JSAs and recipients of preretirement survivor annuities to receive less than they would if Defendants used current and reasonable actuarial assumptions. By contrast, for non-pilot Participants of the Plan, Defendants use current and reasonable assumptions to calculate JSA benefits.

---

[1] A "setback" is a method of adjusting mortality rates by assuming a participant or beneficiary will have the same mortality rates as someone younger than them. For example, a 3-year setback for a 65-year-old will assume the person has the mortality rate of a 62-year-old.

15.     Defendants' use of formulas based on outdated actuarial assumptions to calculate the benefits of former pilots violates ERISA's actuarial equivalence requirements and results in Plaintiffs and the Class receiving less than they would if Defendants used the reasonable and current assumptions required by ERISA and the accompanying Treasury regulations.

16.     The damage caused by Defendants' unlawful use of formulas based on unreasonable actuarial assumptions to calculate JSA and preretirement survivor annuity benefits for pilots has negatively affected and will continue to negatively affect Plaintiffs and Class Members for the rest of their lives (and the lives of their spouses too).

17.     Plaintiffs bring this action on behalf of a Class of retired pilots receiving JSAs between 50% and 100%, and QPSA recipients, pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3). Plaintiffs seek all appropriate equitable relief, including but not limited to a declaration that the Plan's formulas for determining JSAs for pilots and QPSAs for their beneficiaries violate ERISA's actuarial equivalence and non-forfeitability requirements; an injunction requiring the Plan's fiduciaries to ensure that the Plan pays actuarially equivalent benefits to all Class members; an Order from the Court requiring Defendants to pay all amounts improperly withheld in the past and that they will withhold in the future; an Order requiring Defendants to recalculate Plaintiffs and the Class's JSA and QPSA benefits in accordance with ERISA's actuarial equivalence requirement; an Order requiring Defendants to increase the amounts of Plaintiffs' and the Class's future benefit payments, and any other relief the Court determines to be just and equitable.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332(e)(1), which provides for Federal jurisdiction of actions brought under Title I of ERISA.

19.     This Court has personal jurisdiction over FedEx because it is headquartered in, transacts business in, employs people in, and has significant contacts with this District, and because ERISA provides nationwide service of process.

20.     This Court has personal jurisdiction over the Plan because it offers and pays pension benefits to Participants and beneficiaries in this District, and because ERISA provides nationwide service of process.

21.     This Court has personal jurisdiction over the Investment Board because it transacts business in and has significant contacts with this District, and because ERISA provides nationwide service of process.

22.     This Court has personal jurisdiction over the individual members of the Investment Board because, upon information and belief, each transacts business in, resides in, and has significant contacts with this District and because ERISA provides nationwide service of process.

23.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants may be found in this District, Defendants employed Plaintiffs Abbott and Covic and other Class members in this District, and otherwise does business in this District.

### III.     <u>PARTIES</u>

24.     Plaintiff Craig A. Covic resides in Cordova, Tennessee and is a Participant in the Plan. He worked for FedEx as a pilot for approximately 32 years. His benefits, which Defendants calculated using the Plan's unlawful formula, began on June 1, 2019. Mr. Covic elected the 50% JSA offered by the Plan as a "Qualified" JSA with his wife as the beneficiary.

25.     Plaintiff Mark J. Abbott resides in Port Orchard, Washington and is a Participant in the Plan. He worked for FedEx as a pilot for approximately 27 years. His benefits, which Defendants calculated using the Plan's unlawful formula, began on July 1, 2022. Mr. Abbott elected the 50% JSA (with Pop Up) offered by the Plan as a "Qualified" JSA with his wife as the beneficiary.

26.     FedEx is a multinational conglomerate holding company headquartered in Tennessee that provides transportation, e-commerce, and business services through several business segments, including Express, Ground, Freight, and FedEx Services. FedEx is the "plan sponsor" for the Plan within the meaning of § 3(16)(B), 29 U.S.C. § 1002(16)(B). FedEx is also the Plan's "administrator" within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

27.     The Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35). The Plan is joined as a nominal defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted. Pursuant to 29 U.S.C. § 1102, the Plan was established and maintained pursuant to a written instrument known as a "Plan Document."

28.     Upon information and belief, the Investment Board is an unincorporated association based in Collierville, TN. The Investment Board is a fiduciary for the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority or control respecting the management or disposition of assets of the Plan. The Investment Board consists of individuals appointed by the Compensation Committee of the FedEx Board of Directors.

29.     John/Jane Does 1 through 10, inclusive, are the other individual members of the Investment Board responsible for administering the Plan throughout the relevant time period. Their

names and identities are not currently known. Upon information and belief, each transacts business

in, resides in, and has significant contacts with this District.

## IV.   BACKGROUND

### A.   *Actuarial Equivalence Under ERISA*

30.     Actuarial equivalence is a "term of art" (*Stephens v. US Airways Group, Inc.*, 644

F.3d 437, 440 (D.C. Cir. 2011)), which "Congress intended [] to have its established meaning."

*McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). If "Congress has used technical words

or terms of art, it is proper to explain them by reference to the art or science to which they are

appropriate." *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (citations omitted). "And

so, it makes sense that when the 'appropriate methodology' for calculating an actuarially-

equivalent value 'is not apparent from the face of the definition of actuarial equivalence, nor from

the statute or regulations as in effect,' courts look 'to practice within the field of actuarial science.'"

*Adams v. U.S. Bancorp*, No. 22-cv-509, 2022 U.S. Dist. LEXIS 188713, at *16 (D. Minn. Oct. 17,

2022) citing *Pizza Pro Equip. Leasing v. Comm'r*, 147 T.C. 394, 412 (2016), *aff'd*, 719 F. App'x

540 (8th Cir. 2018).

31.     At the heart of actuarial equivalence calculations is the concept of "***present value***."

Actuarial equivalence describes two benefit streams as having equal present values. As the Court

of Appeal for the D.C. Circuit explained: "Two modes of payment are actuarially equivalent when

their ***present values*** are ***equal*** under a given set of assumptions." *Stephens*, 644 F.3d at 440

(emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination

Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991)

("Schwartzmann & Garfield"). Relying on the Society of Actuary's definition of actuarially

equivalent benefits, the *Stephens* court instructed that "within the actuarial field, 'actuarial

equivalen[ce]' is understood to require a present-value calculation." *Adams*, No. 22-cv-509, 2022 U.S. Dist. LEXIS 188713, at *16 citing *Stephens*, 644 F.3d at 440.

32.     Present value is the value of a payment stream, on a specific measurement date, that is adjusted for the time value of money. The Society of Actuaries[2] defines the "Present Value" of a cash flow as the "value of a future cash flow given by a present value model under a particular set of assumptions about ***future economic or other conditions*** . . . ."[3]  In other words, present value is the amount that you would need to invest today at a given interest rate over a specified period in order to have an amount at the end of that period equal to a future amount.

33.     Like the Society of Actuaries, ERISA defines "present value" as "the value adjusted to reflect ***anticipated events***." ERISA § 3(27), 29 U.S.C. § 1002(27). Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.*

34.     Calculating present value requires two primary ingredients: (1) an interest rate and (2) a mortality table. An interest rate discounts future dollars to the present. The rate is often called a "discount rate" because money available now is worth more than the same amount in the future — because it can be invested and earn interest. *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003). ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent."). A mortality table shows the rate of deaths occurring during a selected time interval and predicts the likelihood of death in an individual within the

---

[2] The Society of Actuaries ("SOA") is a global professional organization for actuaries founded in 1949 that provides the exams, certifications, and continuing education necessary to practice as an actuary in the U.S.

[3]     (Emphasis added),     *see*    Society    of    Actuaries,    Glossary.    Available    at: https://www.soa.org/4a537f/globalassets/assets/files/edu/actuarial-glossary.pdf     (last    accessed May 22, 2023).

current year.[4]  Using discount rates and mortality tables, an actuary can determine whether two benefit forms (e.g., an SLA and JSA) are actuarially equivalent by comparing the present values.

35.     ERISA's actuarial equivalence requirements help ensure that pension plan participants receive at least the same value of monthly benefit regardless of the benefit form. The notion is that a participant should not be penalized for selecting one form of pension benefit over another.

36.     Under ERISA, defined benefit plans must offer at least two payment options: one for married participants (i.e., JSAs) and one for unmarried participants (i.e., SLAs). However, a JSA could pay out for longer because plans make payments to the participant and, potentially, the beneficiary. Therefore, if the monthly payment to the participant remains the same, a JSA will be more expensive than an SLA because the beneficiary may also receive payments.

37.     To account for the additional value from a JSA, plan sponsors reduce the participant's SLA or the monthly amount he or she will receive. Plans use formulas based on actuarial assumptions to determine the amount of the reduction to the SLA. The actuarial assumptions generate a conversion factor that is applied to the SLA to determine the reduction in benefits to arrive at the JSA amount. To ensure plans do not shortchange participants and their beneficiaries on their JSA benefits, Congress required that JSAs be at least "actuarial[ly] equivalent" to the SLAs offered to non-married participants. *See* 29 U.S.C. § 1055(d); *see also* 26 U.S.C. § 417 (same requirement under the Tax Code). Accordingly, actuarial equivalence should be cost-neutral, whereby the "cost" to the plan should be the same regardless of the benefit the participant selects.

---

[4] *See* Society of Actuaries, definition of "Mortality" *supra* note 2.

38.     ERISA's actuarial equivalence requirements impose duties on pension plans in form and timing. *See Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000) ("What these provisions [ERISA's actuarial equivalence provisions] mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at ***any other time*** (e.g., on termination rather than retirement) or in ***any other form*** (e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.") (Emphasis added.).

39.     With regards to the ***form*** of pension benefit, ERISA requires that qualified JSAs ("QJSAs") be at least the actuarial equivalent of the value of the SLA offered to the retiree at the times benefits commence. 29 U.S.C. § 1055(d)(1). The Tax Code repeats this definition at 26 U.S.C. § 417(b)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life of the participant") and § 417(g)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life of the participant").[5] A plan can offer multiple QJSAs ranging from 50% to 100%. 29 U.S.C. § 1055(d)(1).

40.     A plan must designate one of the QJSAs as the default option for married participants, which can be more valuable than the other QJSAs offered (26 C.F.R.§ 1.401(a)-20, Q&A 16) but must be *at least* the actuarial equivalent of the SLA (29 U.S.C. § 1055(d)(1)). If the plan offers optional forms of benefit that are more valuable than the SLA, then the default QJSA must be of at least equal value to that benefit form. *See* 26 C.F.R. § 1.401(a)-20, Q&A 16. That

---

[5] The Internal Revenue Code (the "Tax Code") has parallel provisions for ERISA's actuarial equivalence requirements, and the Treasury regulations provide further guidance into the rules. *See* 26 U.S.C. §§ 417(b)(2), 411(c)(3); *see also* 26 C.F.R. § 1.411(c)-1(e) (referring to the "actuarial equivalence" of the participant's accrued benefit in conformance with Treasury regulations).

way, married and unmarried participants have at least one form of benefit available to them that is equivalent to the most valuable benefit form.

41.    Under ERISA, plans must also offer a QPSA. *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity paid to the participant's surviving spouse if the participant dies before his or her benefits commence. *See* ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be at least the actuarial equivalent of the amount the spouse would have received if the participant had selected the plan's default QJSA and died. ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

42.    With regards to the ***time*** a retiree opts to start receiving benefits, ERISA requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit[.]" § 204(c)(3), 29 U.S.C. § 1054(c)(3). ERISA defines "normal retirement age" as age 65, or younger if provided by the pension plan. ERISA § 3(24), 29 U.S.C. § 1002(24); *see also* 26 U.S.C. § 411(a)(8); Treas. Reg. § 1.411(a)–7(b). In other words, if a participant chooses to begin receiving benefits prior to the "normal retirement age," the benefit must be at least the actuarial equivalent of the amount the retiree would have received as an SLA at the normal retirement age.

43.    ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is nonforfeitable. The Treasury regulation which "defines the term 'nonforfeitable' for purposes of these [non-forfeitability] requirements," 26 C.F.R. § 1.411(a)-4(a), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." Therefore, distributions of retirement benefits that are less than their actuarial equivalent value constitute an impermissible forfeiture under ERISA § 203(a), 29 U.S.C. § 1053(a).

13

**B.      *Actuarial Equivalence Requires Reasonable Assumptions***

44.      Reasonable assumptions must underlie the actuarial computation of present value to achieve equivalence.[6] As discussed above, ERISA defines "present value" as "the value adjusted to reflect ***anticipated events***. Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.* (emphasis added.)

45.      The Treasury regulations repeatedly reference using reasonable assumptions when performing actuarial equivalence calculations. For example, the Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R.  § 1.401(a)-11(b)(2) (emphasis added).   Likewise, the Treasury regulation discussing protected accrued benefits defines "[a]ctuarial present value" as meaning "determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added). Further, when making actuarial reductions to determine the early retirement benefits of terminated vested participants — which 29 U.S.C. § 1056(a)(3) governs — the corresponding Treasury regulations instruct plans to use "reasonable actuarial assumptions." 26 C.F.R. § 1.401(a)-14(c)(2). It "would be strange for the [Treasury] Commissioner to provide greater protection to participants who were terminated before reaching minimum early-retirement age rather than those who are active." *Adams*, 2022 US Dist. LEXIS 188713, at *21.

46.      There is also a reasonableness requirement for lump-sum distributions. Indeed, within the context of cash balance plans, the regulations require optional forms of benefit to be

---

[6] "To be equivalent means to be 'equal in force, amount, or value.' [Definition of] *Equivalent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/equivalent. Only accurate and ***reasonable actuarial assumptions*** can convert benefits from one form to another in a way that results in equal value between the two." *Urlaub v. CITGO Petro. Corp.*, Docket No. 21 C 4133, 2022 US Dist. LEXIS 30616, at *19–20 (ND Ill. Feb. 22, 2022).

actuarially equivalent "using reasonable actuarial assumptions." 26 C.F.R. § 1.411(a)(13)-1(b)(3). When comparing optional forms of benefits to a QJSA, plans must use either the "applicable" mortality table and interest rates, which are "considered reasonable actuarial assumptions," or specify their own "reasonable interest rate and reasonable mortality table." 26 C.F.R. §§ 1.417(a)(3)-1(c)(2)(iv)(A)–(B) and (f)(ii)(2)(i)(A)–(B). As the court in *Adams* stated: "***A reasonableness requirement is consistent with ERISA's structure and purpose***." *Adams*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *21 (emphasis in original).

47.     The American Academy of Actuaries (the "Academy"), a professional organization that represents and unites actuaries in all practice areas, similarly requires using reasonable actuarial assumptions. In 1988, the Academy created the Actuarial Standards Board ("ASB"), which promulgates standards of practice for the entire profession in the United States. The ASB issues actuarial standards of practice ("**ASOPs**") that discuss how each demographic (i.e., mortality) and economic (i.e., interest rate) assumption that an actuary selects must be reasonable. *See* ASOP Nos. 35 and 27.

48.     The ASOPs, published by the ASB, dictate that "each economic assumption used by an actuary should be reasonable." *See* ASOP 27, para. 3.6. An assumption is "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the ***measurement date***," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

49.     ASOP 35, discussing Demographic and Other Noneconomic Assumptions, explains that an actuary "should select reasonable demographic assumptions in light of the particular

15

characteristics of the defined benefit plan that is the subject of measurement."[7] Para. 3.3.5 — titled

"Select a Reasonable Assumption" — echoes this idea and states that an assumption is reasonable

if it "reflects the actuary's professional judgment," "takes into account historical and current

demographic data that is relevant as of the **measurement date**," and "reflects the actuary's estimate

of future experience." *Id.* (emphasis in original).

50.     Courts have also signaled that plans should use reasonable actuarial assumptions to

calculate pension benefits. *See Smith v. Rockwell Automation, Inc.*, 438 F. Sup. 3d 912, 921 (ED

Wis. 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use

at the time of the benefit determination"); *Masten v. Metropolitan Life Ins. Co. Empl. Bens.

Committee*, 543 F. Sup. 3d 25, 33 (SDNY 2021) ("the Court finds it plausible that the Plan's use

of decades-old mortality tables is not a 'reasonable' actuarial assumption in light of the ready

availability of updated alternatives . . . the Court concludes that **ERISA requires that Plan

administrators use reasonable actuarial assumptions when converting SLAs into alternative

benefits**" (emphasis added); *Urlaub,* 2022 US Dist. LEXIS 30616, at *19 ("it cannot possibly be

the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality

assumptions"); *Dooley v. Am. Airlines, Inc.*, No. 81-C-6770, 1993 US Dist. LEXIS 15667, 1993

WL 460849, at *11 (ND Ill. Nov. 4, 1993) ("The term 'actuarially equivalent' means **equal in

value** to the present value of normal retirement benefits, determined on the basis of actuarial

assumptions with respect to mortality and interest which are **reasonable** . . . .") (emphasis added).

51.     The assumptions pension plans use to determine actuarial equivalence are not

reasonable simply by being expressed in the plan document. *See Laurent v. Pricewaterhouse*

[7] See ASOP 35, Section 3 Analysis of Issues and Recommended Practices. Available at: https://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/ (last accessed May 22, 2023).

*Coopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015) ("ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit"); *Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence'").

## V.   FACTUAL ALLEGATIONS

### A. *The Plan*

52.     FedEx established the Plan on June 1, 1978, in part, to help employees "work toward financial security . . . during [their] working career at FedEx."

53.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

54.     All Participants in the Plan are current or former employees of FedEx and its subsidiaries or affiliates. Based on data from the most recently filed public documents, the Plan has 23,196 Participants and Beneficiaries receiving payments from the Plan; there are 119,519 active participants as of May 30, 2022.   *See* Form 5500 for the Plan (2021).

55.     Under the Plan, pilots and non-pilot employees accrue benefits differently. Non-pilot employees hired on or after June 1, 2003, are eligible to participate in the Plan's cash balance formula. Under these provisions, known as the Portable Pension Account ("**PPA**") provisions, Participants are provided with a nominal account that accrues compensation credits (5% of pay and up to 8% for more senior workers) as well as any applicable transition credits and interest credits. When a Participant opts to start receiving pension benefits, his or her PPA balance is converted into the form of benefit selected. Employees as of May 31, 2003, had the option of

switching from the TPB to the PPA. As of May 31, 2008, all non-pilot Participants stopped accruing benefits under the TPB and began accruing benefits under the PPA. Benefits for non-pilot Participants under the TPB provisions are based on a Participant's average annual earnings and years of credited service.

56.     Pilots earn benefits under the TPB formula. Under the TPB, pilots' accrued benefit is determined as the greatest of: (i) the Final Average Earnings Formula, (ii) the Pilot Final Average Earning Formula, or (iii) the Flat Dollar Formula. The first two formulas are based on a pilot's years of service and final average earnings, while the last formula is based on an Annual Benefit Amount and the pilots' years of service prior to and after June 1, 1999. The formula that produces the highest amount is the formula used to determine a pilot's accrued benefit under the Plan.

57.     Effective February 1, 2016, the Normal Retirement Age under the Plan was changed from 60 to 62.[8] Starting at age 55, pilots can retire early. To account for the longer period over which the Plan anticipates paying Participants, the Plan reduces early retirees' benefit by .25% for each month that the benefits precede the Participant's 60th birthday. For example, a Participant who begins benefits at age 55 will have his benefits reduced by 15% (3% each year).

58.     The default form of payment for unmarried Participants is the SLA. The default form for married Participants is the 50% JSA.

59.     The Plan also offers Participants other forms of benefit, including 50%, 75%, and 100% JSAs, life annuities with years certain (5, 10, and 15 years), pop-up JSAs (which provides a reduced JSA benefit but if the beneficiary predeceases the participant the payments "pop" up to

---

[8] Benefits accrued prior to February 1, 2016, continue to be administered with a normal retirement age of 60. The change in Normal Retirement Age impacts only benefits accrued after January 31, 2016, and only if certain conditions are met. If those conditions are met, a portion of the benefit is paid to pilots as a lump sum through FedEx's non-qualified plan.

the amount of the SLA) a social security leveling option, cash refund option and a lump sum (only available for PPA). The Plan also offers a Preretirement Survivor Benefit (i.e., a QPSA). For married pilots that elect any payment form other than a 50%, 75% or 100% JSA, a spouse must waive his or her rights to the contingent JSA benefit by providing written and notarized consent.

60.     The Plan uses different formulas for determining payable benefits for non-pilots and pilots. For ***non-pilots***, the Plan uses the "applicable" interest rate and mortality table within the meaning of Tax Code § 417(e) to convert the PPA or the SLA to an optional form of benefit, including lump sums. In other words, non-pilots have their benefits determined using the assumptions prescribed by the Treasury. For ***pilots***, on the other hand, the Plan converts TPB benefits to an optional form "computed on the basis of the UP-1984 Mortality Table for participants and set back three (3) years for all beneficiaries ("-3B") and interest at seven percent (7%) per annum."  Further, for pilots who participated in the former Flying Tiger plan, the Plan converts TPB benefits to an optional form "computed on the basis of the 1971 Group Annuity Mortality Table for participants set back six (6) years for all beneficiaries and with interest at six percent (6%) per annum."

### B.     *The Plan's Actuarial Assumptions Are Unreasonable*

61.     As discussed, throughout the relevant period, the Plan used formulas based on the following assumptions to determine the amount of pilots' optional forms of benefits: UP-84 (-3B) for beneficiaries and a 7% interest rate.[9]

---

[9] The Plan uses formulas based on similarly outdated assumptions for converting the SLA to a JSA and to a QPSA for pilots who participated in the former Flying Tiger Plan: the 1971 GAM Table (-6B) and 6%. These pilots are similarly being damaged by Defendants' use of formulas based on outdated actuarial assumptions.

62.     Neither the interest rate nor the mortality tables underlying the Plan's formulas for calculating pilots' JSAs and QPSAs reflect the current economic conditions or the current mortality rates of the pilots during the relevant time period when Defendants calculated Plaintiffs' and the Class's benefits. The use of antiquated interest rates and mortality tables is unreasonable and unlawful under ERISA.

### i.     *Reasonable Discount Rates*

63.     The Treasury is a reliable source for a "reasonable" discount rate for any given year. The Treasury regularly updates the discount rate, known as the "applicable interest rate." According to the Treasury, pension plans should use discount rates that reflect the actuary's "best estimate," anticipated future events, and economic data as of the measurement date. The "applicable interest rate" is based on corporate bond yields and is updated throughout the year.

64.     The applicable interest rate is a yield curve. Yield curves provide for different rates depending on when future payments are made. The applicable interest rate is based on the first, second, and third Segment Rates. *See* 26 U.S.C. §§ 417(e)(3)(C) and 430(h)(2)(C).  The Segment Rates are determined using yields on corporate bonds with maturities of 0 to 5 years, 5 to 20 years, and beyond 20 years. The Segment Rates are appropriate benchmarks for pension plans because the maturity rates closely correspond to the time period over which a pension plan will pay its retirees. The following shows the IRS Segment Rates over the past six years:

| Year | 417(e) Segment Rates for March | Effective Rate |
|------|-------------------------------|----------------|
| 2023 | 5.00% / 5.20% / 5.15% | 5.11% |
| 2022 | 2.44% / 3.71% / 3.94% | 3.36% |
| 2021 | 0.69% / 2.92% / 3.69% | 2.43% |
| 2020 | 2.22% / 3.08% / 3.73% | 3.01% |
| 2019 | 2.86% / 4.00% / 4.42% | 3.76% |
| 2018 | 2.91% / 3.99% / 4.43% | 3.77% |
| 2017 | 2.06% / 3.95% / 4.75% | 3.58% |

65.     Defined benefit plans use the "applicable interest rate" to calculate the present values of lump sum benefits. Section 417(e) of the Tax Code provides that a pension plan can offer a lump sum benefit. However, the present value of the lump sum must be at least equal to the present value calculated using the "applicable mortality table" and "applicable interest rate" (collectively referred to as the "**Treasury Assumptions**"). *See* 26 U.S.C. § 417(e)(3). While a plan can subsidize a lump sum benefit, the applicable interest rate (coupled with the applicable mortality table) sets a "floor" for the present value below which a lump sum cannot go.

66.     Indeed, for providing the relative value of all benefit forms, including JSAs, the applicable interest rate is considered *per se* reasonable for actuarial equivalence purposes. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

### ii.        *Reasonable Mortality Tables*

67.     Mortality tables show the probability of death for a specific group of individuals or population groups. Pension Plans use mortality tables to estimate the probability of a participant dying before they receive another year of benefits. Mortality is a key assumption in determining benefits and liabilities that should represent the "best estimate" of the expected duration of future benefit payments.

68.     Mortality tables for pension plans should be updated regularly to reflect changes in life expectancy. Indeed, "plan management should consider the specific demographics of their plan when evaluating the appropriate mortality or other assumptions to use, as well as relevant available mortality data. . . . *[management] should consider any published new mortality data for their plans in relation to their plan-specific mortality experience and future expectations*."[10]

---

[10] (Emphasis added) PWC, US Pensions Guide, Defined benefit plan financial statements, § 9.4.4, June 30, 2022. Available at: https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/pensions-

69.     Several organizations publish mortality tables used by pension plans, but the primary source is the SOA. The Retirement Plan Experience Committee ("RPEC") of the SOA publishes the mortality tables upon which many pension plans across the country rely. The SOA bases its mortality tables on "experience studies" that measure the actual mortality experience of pension plan participants in the United States.

70.     These "experience studies" were the basis for the mortality tables published by the SOA in 1971, 1976 (the "**UP-84**"), 1983 (the "**1983 GAM**"), 1994 (the "**1994 GAR**"), 2000 (the "**RP-2000**"), 2014 ("**RP-2014**") and 2019 (the "**Pri-2012**"). Periodically, the tables are updated to account for changes in the mortality experience of US workers over the years. The SOA typically publishes new mortality tables or sets of tables several years after the date they are named after. For example, the SOA released the RP-2000 mortality tables in 2000 based on the mortality experience of pension plan participants from 1990–1994.

71.     For the past 50 years, the SOA's experience studies show a steady upward trend in life expectancy. Generally, retirees in the last 15 years live longer than retirees in the 1970s and 1980s. A study that the SOA published in 2014 indicated that the RP-2000 mortality tables "no longer reflect the actual mortality experience of pension plan participants and projected trends in that experience."[11] When the SOA released the RP-2014 mortality tables, the managing director for the SOA predicted that the update would increase liabilities for pension plans between 4% and

---

and-employee-benefitspeb/peb_guide/Chapter-9-PEB/94_Defined_benefit_plan_financial_statements_8.html (last accessed June 8, 2023).

[11] Mortality Tables for Determining Present Value Under Defined Benefit Pension Plans, 26 C.F.R. 1, 82 FR 46388, 46397.

8%.[12] The increase in liabilities spurred Moody's to conclude that plan sponsors would have to divert $110 billion to their pension plans over seven years to fund additional liabilities.[13] The chart below shows the increase in life expectancy over the last few decades and the corresponding impact on plan liabilities:



See Plaintiff's Expert Report, *Rockwell v. Berube*, No. 20-cv-01783, ECF No. 55-5 at 18.

72.      As the graph above demonstrates, a 70-year-old today is expected to live roughly 30% longer than a 70-year-old retiree in the 1980s. It is improper for a pension plan to use a 50-year-old mortality table to calculate a retiree's benefits in 2019 or 2022 because antiquated

---

[12]  *See* Society of Actuaries Pledges Faster Mortality Scale Updates, available at: https://www.plansponsor.com/society-of-actuaries-pledges-faster-mortality-scale-updates/    (last accessed May 31, 2023)

[13]  *Id.*

mortality assumptions fail to account for the improvements in life expectancy over the past few decades. For example, the SOA released the UP-84 — comparable to the GAM 71 shown above — in 1976. Data collected from 1965–1970, now **over 50 years old**, form the basis of the UP-84. In the last 50 years, there have been substantial improvements in lifestyle habits and healthcare, which lowered the mortality rates of pensioners. The UP-84 does not account for these improvements.

73.     Further, the UP-84 was compiled in an era when much of the workforce was male; only 20% of the mortality experience reflected in the UP-84 is based on female employee experience. Because the SOA released the UP-84 before the significant improvements in life expectancy and shifts in the US workforce in the last 50 years, it is no longer an appropriate table for calculating pension benefits for pilots from 2018 to the present. Nevertheless, pension plans, like the Plan, continue to use the UP-84 to calculate the benefits for pilots today.

74.     A benchmark for reasonable mortality rates is the mortality assumption released by the Treasury. Like discount rates, the Treasury also releases the "applicable mortality table," based on the most up-to-date SOA mortality tables. When prescribing the applicable mortality tables, the Secretary must consider the "results of available independent studies of mortality of individuals covered by pension plans." *Id.* In other words, the IRS defers to the SOA when it comes to the mortality rates of pensioners.

75.     Plan sponsors must make minimum contributions to their pension plans, and the Treasury prescribes the tables that plans should use. For plan years beginning on or after January 1, 2023, the Treasury regulations prescribe the use of mortality tables based on the Pri-2012 Report,[14] which is based on RPEC's experience study for the period 2005–2014 and is the best

---

[14] *See* IRS Notice 2022-22; *see also* 87 FR 25161, 25163.

24

available study of the actual mortality experience of participants.[15] The "applicable mortality table" must be updated (at least every ten years, but, in practice, the Treasury updates the rates more frequently) and "must be based on the actual experience of pension plans . . . ." 26 U.S.C. § 430(h)(3)(A).

76.     For measuring pension plan liabilities, plan sponsors can apply to use plan-specific mortality tables that more accurately reflect the experience of a given plan's participants. *See* 26 U.S.C. § 430(h)(3)(C). If a plan has enough participants and has been around long enough, it can apply to the IRS to use company-specific mortality tables based on the experience of the plan's participants to determine present values under § 430. Similarly, plans can use separate mortality tables for disabled participants because disabled participants generally have different mortality rates from healthy pensioners. *See* 26 U.S.C. § 430(h)(3)(D). Like the plan-specific tables, mortality tables used for disabled participants must be periodically updated. Through its regulatory guidance, the Treasury believes that it is important to regularly update mortality tables used by pension plans to ensure that they are accurate and reflect the latest mortality trends.

77.     As discussed, the Treasury Assumptions, including the applicable mortality table, are *per se* reasonable for determining the present values of different benefit forms. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

## C.    The Plan's Formulas for Calculating Survivor Annuities and Preretirement Annuities for Pilots Do Not Satisfy ERISA

78.     As discussed, throughout the relevant period, the Plan used the UP-84 (-3B) and a 7% discount rate to determine JSA and QPSA benefits for pilots and their beneficiaries.

---

[15] *See* 87 FR 25161, 25163.

79.     Using these assumptions was and continues to be unreasonable because the discount rate does not reflect the economic conditions on the Participants' measurement dates (i.e., the dates Defendants determined their benefits). Similarly, the mortality table does not reflect the experience of the Participants or pensioners in general, let alone future "anticipated events" (i.e., the anticipated mortality rates of pensioners).

80.     For nearly all Participants, except pilots, the Plan uses the applicable Treasury Assumptions to determine benefits. For example, for non-pilot employees, the Plan uses the applicable Treasury Assumptions to convert TPB benefits to optional forms of benefit. The Plan also uses the applicable Treasury Assumptions to convert the PPA benefit to an optional benefit form and to calculate lump sums for either the TPB or the PPA benefit. Likewise, Defendants use the applicable Treasury Assumptions when converting participants' PPA or TPB benefits to optional benefit forms in the FedEx Freight, Inc. Pension Plan. Starting February 1, 2012, Defendants updated the formula used to calculate TPB benefits for participants that earned benefits under the FedEx Freight West, Inc. Pension Plan from the UP-84 and 7% to the applicable Treasury Assumptions.

81.     Defendants have refused to apply current actuarial assumptions to the formulas for determining pilots' benefits under the Plan. Inexplicably, Defendants use formulas based on outdated and unlawful actuarial assumptions that cause Plaintiffs and Class Members to receive less than the "actuarial equivalent" of their vested benefits, in violation of ERISA's actuarial equivalence requirements.

82.     The unreasonably low conversion factors produced by the UP-84 (-3B) and 7% result in JSA benefits that violate ERISA's actuarial equivalence requirements. The JSA benefits produced using this formula are not at least actuarially equivalent to the SLA that pilots were

offered when their benefits started. Accordingly, Plaintiffs and the Class are receiving substantially less each month than they would have if the Plan had used the reasonable assumptions required.

83.   The conversion factors produced by these assumptions, when calculating JSAs and QPSAs are unreasonably low compared to the conversion factors produced using reasonable assumptions. The following chart shows a comparison of the conversion factors using the Plan's assumptions and the conversion factors using the applicable 417(e) assumptions from the years Plaintiffs' began receiving benefits:

| Year | Benefit Form | The Plan's Conversion Factors | Monthly Amount Using Conversion Factors Produced by Plan Formula | Conversion Factors Produced Using Treasury Assumptions | Monthly Amount Using the Treasury Conversion Factors | Percent Difference in Benefit Amount |
|------|------|------|------|------|------|------|
|      | SLA | N/A | $1,000.00 | N/A | $1,000.00 | N/A |
| 2019 | 50% JSA | 0.8942 | $894.20 | 0.9292 | $929.20 | **3.91%** |
|      | 100% JSA | 0.8087 | $808.70 | 0.8677 | $867.70 | **7.30%** |
| 2022 | 50% JSA | 0.8939 | $893.90 | 0.9238 | $923.80 | **3.35%** |
|      | 100% JSA | 0.8081 | $808.10 | 0.8584 | $858.40 | **6.22%** |

84.   The chart above demonstrates that Defendants' use of unreasonable and unlawful assumptions results in a substantial difference in monthly income.

85.   Plaintiff Covic began collecting benefits under the Plan on July 1, 2019. He accrued and was offered an SLA that would have paid him $11,260.02 per month. He selected the 50% JSA, which pays $10,068.82 per month. If the April 2019 Treasury Assumptions were used to

calculate his benefits, Plaintiff Covic's benefit would be $10,462.81 or $393.99 more per month. By using a formula based on outdated actuarial assumptions that produce unreasonably low conversion factors, instead of reasonable, current actuarial assumptions like the applicable Treasury Assumptions, Defendants reduced the present value of Plaintiff Covic's benefits by approximately $70,703 (past damages of $19,305.51 and future damages of $51,397.49).

86.     Plaintiff Abbott began collecting benefits under the Plan on July 1, 2022. He accrued and was offered an SLA that would have paid him $10,833.33 per month. He selected the 50% JSA with pop-up, which pays $9,546.55 per month. If the April 2022 Treasury Assumptions were used to calculate his benefits, Plaintiff Abbott's benefit would be $9,919.00 or $372.45 more per month. By using a formula based on outdated actuarial assumptions that produce unreasonably low conversion factors, instead of reasonable, current actuarial assumptions like the applicable Treasury Assumptions, Defendants reduced the present value of Plaintiff Abbott's benefits by approximately $73,735 (past damages of $4,841.85 and future damages of $68,893.15).

### D.     *The Plan Uses Updated Actuarial Assumptions for Other Purposes*

87.      Defendants regularly update the actuarial assumptions used for determining the present value of the Plan's pension benefit obligation ("PBO"). The PBO is the present value of all future pension payments that a plan must make. The PBO is a liability on a company's balance sheet, and, therefore, public companies like FedEx must disclose their PBO to investors in their annual 10-K filings with the SEC. If determining pension benefits is one side of the actuarial calculation coin, the other side would be determining a plan's PBO. Like calculating pension benefits, plan sponsors use formulas based on actuarial assumptions to calculate a plan's PBO. The actuarial assumptions underlying the Plan's PBO must be reasonable to report the Plan's PBO to FedEx's shareholders accurately.

88.     Defendants are well aware of the requirement to regularly update the assumptions it uses to calculate its PBO. Indeed, FedEx does so for its non-pilot Participants in the Plan. FedEx develops the discount rate "by utilizing the yield on a theoretical portfolio of high-grade corporate bonds that match cash flows to benefit payments . . . ."[16] These rates, which are consistent with standard indices such as the Citigroup Pension Liability Index and Mercer Above Mean Curve, are used as benchmarks to determine the discount rate to use. FedEx's auditors compare "management's selected discount rate to an independently developed range of reasonable discount rates." *Id.* at 75. FedEx used the following discount rates to determine the present value of the Plan's liabilities:

| Year | Discount Rate |
|------|---------------|
| 2022 | 4.25% |
| 2021 | 3.23% |
| 2020 | 3.14% |
| 2019 | 3.85% |
| 2018 | 4.27% |
| 2017 | 4.08% |
| 2016 | 4.13% |

89.     FedEx determines its discount rate at the end of each fiscal year, on May 31. With the assistance of actuaries, FedEx selects AA-rated (or higher) corporate bonds that match the cash flows to benefit payments. In other words, when FedEx measures its pension liabilities, which directly impacts the amount the company must contribute to the Plan, it uses regularly updated discount rates based on AA corporate bonds.

90.     FedEx also regularly updates the mortality tables to calculate the Plan's PBO. FedEx, like the Treasury and many other pension plans, relies on the SOA tables. In late 2014, the SOA released the RP-2014 family of mortality tables, which many plans quickly adopted for

---

[16] *See* FedEx's Form 10-K for the fiscal year ending May 31, 2022, at 74.

calculating pension liabilities, including FedEx. In its 10-K for the fiscal year ending May 31, 2015, FedEx stated that the "implementation of new U.S. mortality tables in 2015 resulted in an increased participant life expectancy assumption, which increased the overall projected benefit obligation by $1.2 billion."[17] Similarly, following the release of the Pri-2012 tables by the SOA in 2019, FedEx stated that "the demographic experience in 2020 reflects an update to our mortality assumption . . . ."[18]

91.     With each new release of an updated mortality table, FedEx updated the mortality assumption used to calculate the Plan's liabilities. In the 2022 Annual Report, FedEx stated that it incurred a $1.6 billion loss with regards to its retirement plans, in part, due to "an update to the mortality assumption . . . ."[19] From 2019 to 2021, FedEx stated in its 10-Ks that the "demographic experience in [2019, 2020, and 2021] reflect[] an update to our mortality and retirement rate assumptions . . . ."[20] Thus, when it comes to determining the present value of Plan liabilities, Defendants regularly update the actuarial assumptions used to ensure they reflect the conditions at the time the liability is measured.

92.     Further, as discussed, Defendants use updated actuarial assumptions to calculate benefits for non-pilot Participants in the Plan. When converting both the TPB and PPA benefits to optional forms for non-pilot Participants, Defendants use the 417(e) Treasury Assumptions. For the FedEx Freight, Inc. Pension Plan, Defendants updated the assumptions to determine optional

---

[17] *See* FedEx's Form 10-K for the fiscal year ending May 31, 2015, at 74.

[18] *See* FedEx's Form 10-K for the fiscal year ending May 31, 2020, at 132.

[19] 2022 Annual Report, at 51.

[20] *See* FedEx's Form 10-K for the fiscal year ending May 31, 2021, at 103.

benefit forms in the last several years. Inexplicably, however, FedEx failed to make the same updates to the formulas used to calculate optional benefit forms for pilots in the Plan.

93.     There is no reasonable explanation for why the Plan uses different assumptions to calculate JSAs for non-pilot and pilot Participants. Despite the absence of any lawful reason for doing so, Defendants continue to employ antiquated and unreasonable assumptions for Plaintiffs and Class Members, causing substantial financial harm.

94.     Defendants' use of unreasonable formulas based on outdated actuarial assumptions for calculating pilots' benefits results in Plaintiffs and the Class Members receiving significantly less than the total amount of benefits to which they are entitled under the Plan and to which they are lawfully entitled under ERISA, to FedEx's financial gain.

## VI.     CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class (the "Class"):

> All pilot Participants and pilot Beneficiaries of the Plan who (1) began receiving benefits on or after six years prior to the date this Complaint is filed, (2) are receiving a JSA with a survivor benefit of at least 50% and no more than 100% of the benefit paid during the pilot's life, or are receiving a QPSA, and (3) are receiving a benefit where the actuarial present value of their annuity as of the date benefits began was less than the actuarial present value of their Normal Retirement Age SLA using the applicable Treasury Assumptions as of the date benefits began. Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plans.

96.     The Class members are so numerous that joinder of all members is impractical. The Class includes hundreds of individuals. Based on government filings, as of December 31, 2021, over 23,196 Participants and Beneficiaries were receiving benefits under the Plan.

97.     Plaintiffs' claims are typical of the Class Members' claims because they arise out of the same policies and practices as alleged herein, and all Class Members are similarly affected by Defendants' wrongful conduct. Plaintiffs and all Class Members seek identical remedies under identical legal theories, and Plaintiffs' claims do not conflict with the interests of any other members of the Class in that the Plaintiffs and the other members of the Class were subject to the same conduct and suffered the same harm.

98.     There are questions of law and fact common to the Class, which predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.   Whether the actuarial assumptions used to determine the value of pilots' JSAs are unreasonable;

B.   Whether the actuarial assumptions used to determine the value of pilot's JSAs violate the actuarial equivalence requirements of ERISA;

C.   Which actuarial assumptions would produce a reasonable conversion factor to apply to Plaintiffs' and Class Members' SLA;

D.   Which actuarial assumptions would produce a reasonable conversion factor to apply to Plaintiffs' and Class Members' SLA to satisfy ERISA's actuarial equivalence requirements;

E.   Whether the actuarial assumptions used by the Plan to calculate pilots' benefits caused harm to Plaintiffs and Class Members;

F.   Whether the Investment Board violated its fiduciary duties of loyalty and prudence under ERISA;

G.   Whether the Investment Board should be enjoined from applying the Plan's formulas for calculating pilots' JSAs and instead be required to calculate benefits for Plaintiffs and Class Members based on reasonable actuarial assumptions; and

H.   Whether Plaintiffs and the Class should receive additional benefits.

99.     Plaintiffs will fairly and adequately represent the Class because Plaintiffs have no interests antagonistic to those of other members of the Class, and the adjudication of their claims will necessarily decide the identical issues for all other Class Members. Plaintiffs are committed to the vigorous prosecution of this action.

100.    Plaintiffs have retained counsel competent and experienced in ERISA and class action litigation.

101.    Plaintiffs do not anticipate any difficulty in management of this matter as a class action.

102.    The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

103.    The requirements of Rule 23(b)(1)(B) are satisfied because prosecution of separate actions by the members of the Class would create a risk of adjudications for individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

104.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief for the Class as a whole.

105.    Individual Class Members do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action because the equitable relief sought by any Class Member will either inure to the benefit of the Plan or affect each Class Member equally. If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is

appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy because the damages suffered by each individual Class Member is relatively modest compared to the expense and burden of individual litigation. It would be impracticable for each Class Member to seek redress individually for the wrongful conduct alleged herein. There will be no difficulty in the management of this litigation as a class action as the legal issues affect standardized conduct by Defendants and class actions are commonly used in such circumstances. Furthermore, since joinder of all members is impracticable, a class action will allow for an orderly and expeditious administration of the claims of the Class and will foster economies of time, effort and expense.

## VII.   CAUSES OF ACTION

### COUNT I: VIOLATION OF ERISA'S JSA
### ACTUARIAL EQUIVALENCE REQUIREMENT
### (ERISA § 205, 29 U.S.C. § 1055)

106.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

107.   The Plan improperly reduces pilots' JSA benefits for pilot Participants and their Beneficiaries below what they would receive if those benefits satisfied ERISA's actuarial equivalence requirements.

108.   ERISA § 205(d), 29 U.S.C. § 1055(d) requires plans to provide QJSAs that are "the actuarial equivalent of a single annuity for the life of the participant." Similarly, the applicable Treasury regulations state that plans must provide QJSAs that are "at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under

34

the plan . . . determined, on the basis of consistently applied ***reasonable actuarial factors***[.]" 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added).

109.    Because the Plan uses outdated, unreasonable actuarial assumptions to calculate pilots' benefits, the JSA benefits they receive (and their beneficiaries receive) are not actuarially equivalent to the SLA Defendants offered them.

110.    Defendants' use of unreasonable actuarial assumptions as set forth herein is a violation of ERISA at Section 205(d), 29 U.S.C. § 1055(d).

111.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

112.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's actuarial equivalence requirements outlined in § 1055(d), including but not limited to the relief set forth below in the Prayer for Relief.

### COUNT II: VIOLATION OF ERISA'S EARLY RETIREMENT ACTUARIAL EQUIVALENCE REQUIREMENT (ERISA § 204, 29 U.S.C. § 1054)

113.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

114.    The Plan's formulas for calculating pilots' JSA benefits are based on outdated, unreasonable actuarial assumptions, which produce monthly benefits that are less than the actuarial equivalent of the participant's SLA at Normal Retirement Age, in violation of ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

115.    ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3) requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit[.]"

116.    Through the use of formulas based on antiquated and unreasonable actuarial assumptions, Plaintiffs and members of the Class who began receiving JSA benefits before Normal Retirement Age had their benefits improperly reduced and are not receiving benefits that are actuarially equivalent to their Normal Retirement Age SLA.

117.    Defendants' use of unreasonable actuarial assumptions as set forth herein is a violation of ERISA at § 204, 29 U.S.C. § 1054.

118.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

119.    Pursuant to ERISA §§ 502(a)(3), 29 U.S.C. §§ 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's actuarial equivalence requirements outlined in § 1054(c)(3), including but not limited to the relief set forth below in the Prayer for Relief.

### COUNT III: VIOLATION OF ERISA'S ANTI-FORFEITURE RULES
### (ERISA § 203, 29 U.S.C. § 1053)

120.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

121.    The Plan uses formulas based on outdated, unreasonable actuarial assumptions, which produces monthly benefits for pilots who receive JSAs that are less than the actuarial

equivalent of their SLA at Normal Retirement Age, causing an illegal forfeiture of benefits in violation of ERISA 203(a), 29 U.S.C. § 1053(a).

122.     Section § 203(a) of ERISA, 29 U.S.C. § 1053(a) establishes "an employee's right to his normal retirement benefit is non-forfeitable[.]" The applicable Treasury regulation states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a).

123.     By using antiquated assumptions, particularly mortality tables based on data that is 50 years old, Defendants underestimate the value of the benefits that participants have accrued, resulting in benefits that are not actuarially equivalent to the SLA at Normal Retirement Age and, therefore, causing an impermissible forfeiture.

124.     Defendants' use of unreasonable actuarial assumptions as set forth herein is a violation of § 203, 29 U.S.C. § 1053.

125.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

126.     Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's non-forfeitability requirements outlined in § 203(a), 29 U.S.C. § 1053(a), including but not limited to the relief in the Prayer for Relief.

**COUNT IV: BREACHES OF FIDUCIARY DUTY**
**(ERISA § 404, 29 U.S.C. § 1104)**

127.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

128.     During all relevant times, the Investment Board was an acting fiduciary of the Plan and was responsible for paying benefits in accordance with ERISA's requirements and the Plan's terms, unless those Plan terms themselves violated ERISA.

129.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), imposes several fiduciary duties on Plan Administrators, including the duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence" — which includes ensuring that benefits paid pursuant to a defined benefit plan conform with ERISA's statutory requirements — and the duty to act "in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with* the provisions of" subchapters I and III of ERISA. 29 U.S.C. § 1104(a)(1) (emphasis added).

130.     Here, the Investment Board and its members are fiduciaries for the Plan because they exercise discretionary authority or discretionary control respecting the management of the Plan as well as authority and control over the disposition of the Plan's assets. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). They had authority or control over the amount and payment of JSAs from Plan assets.

131.     The Investment Board breached these fiduciary duties by administering a Plan that did not conform with ERISA's actuarial equivalence requirements. The Investment Board acted disloyally by causing Plaintiffs and the Class to receive benefits that were not actuarially equivalent to their SLAs at Normal Retirement Age thereby enabling FedEx, as Plan Sponsor, to retain additional money by reducing the minimum amount it was required to contribute to the Plan.

132.     The Investment Board failed to act prudently and diligently by failing to sufficiently review the terms of the Plan, including the formulas used to calculate pilots' optional benefit forms. This caused Plaintiffs and the Class to receive less than the full value of their ERISA-protected

accrued benefit. Further, the Investment Board failed to update the antiquated and unreasonable assumptions used to calculate pilots' benefits despite updating the assumptions used to calculate the Plan's PBO and the benefits of non-pilot Participants.

133.    The Investment Board's breaches as set forth herein caused pilot Participants to forfeit a portion of the accrued benefit.

134.    ERISA requires fiduciaries who appoint other fiduciaries to monitor their actions to ensure they comply with ERISA. FedEx therefore had a fiduciary duty to monitor the actions of the Investment Board to ensure they complied with ERISA.

135.    FedEx breached its fiduciary duties to supervise and monitor the Investment Board by allowing them to pay benefits that were not actuarially equivalent, which is a violation of ERISA.

136.    As a direct and proximate result of these fiduciary breaches, Class members lost millions of dollars in vested accrued pension benefits.

137.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

138.    Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's fiduciary duties outlined in § 404(a)(1), 29 U.S.C. § 1104(a)(1), including but not limited to the relief set forth below in the Prayer for Relief.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.   An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class representatives, and appointing the undersigned to act as Class Counsel;

B.   A declaratory judgment that the actuarial assumptions used in the Plan's formulas for determining pilots' JSAs violate ERISA's joint and survivor annuity requirements set forth in § 205(d), 29 U.S.C. § 1055(d);

C.   A declaratory judgment that the actuarial assumptions used in the Plan's formulas for determining pilots' benefits prior to Normal Retirement Age violate ERISA's actuarial equivalence requirement set forth in § 204(c)(3), 29 U.S.C. § 1054(c)(3);

D.   A declaratory judgment that the actuarial assumptions used in the Plan's formulas for determining pilots' benefits prior to Normal Retirement Age violate ERISA's anti-forfeiture provision at § 203(a), 29 U.S.C. § 1053(a);

E.   A declaratory judgment that the Investment Board breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, following Plan terms that violated ERISA and for failing to pay benefits to pilot Participants in conformance with ERISA's actuarial equivalence and anti-forfeiture requirements outlined in §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

F.   A declaratory judgment that FedEx breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, failing to adequately monitor the Investment Board in the execution of its fiduciary duties;

G.   An Order requiring Defendants to provide an accounting of all prior payments of benefits to the Class under the Plan for which the outdated and unreasonable

40

assumptions discussed herein were used to determine pilots' JSAs, and provide information to recalculate those payments to Class members in compliance with ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

H.     Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plan and ordering Defendants to pay future benefits to pilots in accordance with ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

I.     Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

J.     Restitution of all amounts Defendants kept in the Plan but were obliged to pay to Plaintiffs and other Class Members in accordance with ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

K.     Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of the violations of ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

L.     Relief to the Plan from the Investment Board for its violations of ERISA § 404, 29 U.S.C. § 1104, including a declaration that the formula used to determine JSAs violates ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a); restoration of losses to the Plan and its pilot Participants caused by the

Investment Board's fiduciary violations; disgorgement of any benefits and profits the Investment Board received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to Class Members caused by fiduciary breach so that those amounts owed can be provided to Plan participants; and all appropriate injunctive relief, such as an order requiring the Investment Board to pay all pilot Participants fully ERISA-compliant benefits in the future and to ensure that all benefits it pays to pilot Participants conform to the requirements set forth in ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

M.     An award of pre-judgment interest on any amounts awarded to Plaintiffs and the Class pursuant to law;

N.     An award of Plaintiffs' attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.     Any other relief the Court determines is just and proper.

**SIRI & GLIMSTAD LLP**

/s/ *R. Scott Pietrowski*
R. Scott Pietrowski (Bar No.: 019853)
Lisa R. Considine (*pro hac vice* to be filed)
Oren Faircloth (*pro hac vice* to be filed)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: lconsidine@sirillp.com
E: ofaircloth@sirillp.com

*Attorneys for Plaintiffs*